JUDGE SCHOFIELD

# 13 CIV 3636

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **JANEL GRANT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **v.** | § | |
| | § | Civ. No _____ |
| **GRACE MEAGHER,** | § | |
| **FREDERICK A. MEAGHER, III,** | § | |
| **LISA T. BEFFERT,** | | |
| **STONY LANE LLC,** | | |
| **DR. MARK R. BAUS, and** | | |
| **GRAND PRIX EQUINE LLC,** | | |
| | | |
| **Defendants.** | | |

## COMPLAINT

Plaintiff Janel Grant ("Plaintiff"), in a Complaint against Defendants Grace Meagher and Frederick A. Meagher, III (collectively "the Meaghers"), Lisa T. Beffert (also known as Lisa Tomaselli Beffert) and Stony Lane LLC (collectively "Trainer"), and Dr. Mark R. Baus and Grand Prix Equine LLC (collectively "Dr. Baus"), states and alleges as follows:

### NATURE OF THE ACTION

1.     This is an action to collect damages stemming from the actions and inactions of Defendants during a horse lease extending from May 1, 2012 to August 31, 2012 (the "Lease") that caused Plaintiff's horse, a Holsteiner gelding ("Starman"), to suffer at least one career-ending injury.  Defendants caused the animal's premature retirement and complete loss of monetary value as a sale, lease, competitive jumping, and serviceably sound riding horse. Defendants' conduct was compounded by, *inter alia*, a shocking pattern of misrepresentation and concealment in which Defendants made numerous medical decisions without Plaintiff's knowledge or consent, including drugging of a limping horse for competition and the abrupt cessation of veterinary care for an animal suffering from an undiagnosed injury.

2.      Defendants are liable for negligence, gross negligence, recklessness, professional negligence, lack of informed consent, trespass to chattel, conversion, breach of contract, breach of good faith and fair dealings, breach of fiduciary duty, tortious interference with prospective economic advantage, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and unfair trade practices under the statutory and common laws of the State of New York, resulting in substantial monetary loss suffered by Plaintiff.

## THE PARTIES

3.      Plaintiff Janel Grant is a citizen of the State of New York, and in particular, this Judicial District.

4.      Upon information and belief, Defendants Grace Meagher and Frederick Meagher are citizens of the State of Connecticut.

5.      Upon information and belief, Defendant Lisa Beffert is a citizen of the State of Connecticut.

6.      Defendant Lisa Beffert is doing business under the assumed name Stony Lane LLC.  Defendant Stony Lane LLC is a domestic limited liability company organized and existing under the laws of Connecticut and has a principal place of business at 3-8 Forest Glen Circle, Middletown, CT, 06457.

7.      Upon information and belief, Stony Lane LLC is a full service show stable located at the Ox Ridge Hunt Club in Darien, CT.

8.      Upon information and belief, Defendant Dr. Mark Baus is a citizen of the State of Connecticut.

9.      Defendant Dr. Mark Baus is doing business under the assumed name Grand Prix Equine LLC.   Defendant Grand Prix Equine LLC is a domestic limited liability company organized and existing under the laws of Connecticut and has a principal place of business at 434

Main Street South, Bridgewater, CT 06752.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and because the action is between citizens of different states.

11.    This Court has personal jurisdiction over all Defendants because, upon information and belief:

    a.   The Meaghers and Trainer have transacted business in the State of New York in connection with the subject matter of this Complaint, including discussions and negotiations related to execution of the Lease;

    b.   The Meaghers and/or Trainer, or an agent acting on their behalf, entered the State of New York on multiple occasions, including to (i) conduct a trial ride(s) on Starman; (ii) conduct a pre-lease examination on Starman; (iii) pick up Starman at the commencement of the Lease; (iv) return Starman at the conclusion of the Lease; and (v) compete with Starman in at least two separate multi-day New York horse shows, including while he was injured;

    c.   Dr. Baus, owner and operator of Grand Prix Equine LLC, practices veterinary medicine in the State of New York; is licensed as a veterinarian in New York (License No. 004648); and states on his website that he and Grand Prix Equine LLC have the "privilege" of providing veterinary services in the State of New York;

    d.   Dr. Baus and Grand Prix Equine LLC collaborated with Plaintiff and Plaintiff's veterinarian after the conclusion of the Lease, at least telephonically, regarding veterinary care of Starman while Plaintiff and Starman were situated in the State of New York; and

    e.   All Defendants caused ongoing harm to Plaintiff in the State of New York by way of allowing Starman to be returned to New York in an undiagnosed, injured, underweight, and distressed state, and without warning or notification to Plaintiff of the horse's condition, in effect quietly "dumping" him in New York.

12.    Venue is proper in this District under 28 U.S.C. § 1391 because at least a substantial part of the events giving rise to Plaintiff's claims occurred in this District, because a substantial part of the property that is the subject of the action is normally situated in New York,

3

and because Defendants are subject to personal jurisdiction in this District.

13.     A real, immediate, and justiciable controversy exists between Plaintiff and Defendants relating to Defendants' acts.

## STATEMENT OF FACTS

**I.     Summary**

14.     Plaintiff has been the exclusive owner of the horse Starman since 2005.

15.     Starman is an experienced show horse, being shown consistently every year that Plaintiff has owned him in major competitions in states including, at least, New York, New Jersey, Connecticut, Pennsylvania, Vermont, and Illinois in competitive jumping classes.

16.     Starman has a reputation of being a safe, honest, and reliable riding and competitive show horse. Starman was one of three horses hand-selected by an Olympic equestrian medalist to be featured in a riding clinic video, filmed in May 2009. Starman is also graced with an extraordinary talent for jumping, as evidenced by the multiple pictures attached as Exhibit A.

17.     Plaintiff was an active, hands-on owner until she took ill, suffering from symptoms of severe illness, in January 2012. After months of deteriorating health, including a cancer scare that caused Plaintiff to be a bedridden "absentee-owner," e.g., unable to visit, Plaintiff sought a lease for Starman, allowing her to focus solely on regaining her health.

18.     In April of 2012, Plaintiff and the Meaghers entered into the Lease of Starman for the period of May 1, 2012 to August 31, 2012. The Meaghers represented that Grace Meagher was to have exclusive use of Starman for the intended purpose of riding and competition, and therefore be fully liable under the Lease.

19.     Autumn Farms served as the agent for Plaintiff in arranging the Lease.

20.     Trainer served as the agent for the Meaghers in arranging the Lease.

21.     Plaintiff's agent has an established professional relationship leasing horses and/or ponies into Trainer's care, custody, and control.

22.     Pursuant to the Lease agreement, Starman was required to be under the care, custody, and control of Trainer "at all times" during the Lease term.

23.     The parties agreed that Starman would be boarded at Stony Lane LLC, a barn owned and operated by Trainer and located at the Ox Ridge Hunt Club in Darien, Connecticut.

24.     The pictures below depict Starman's normal appearance before the Lease and his skeletal appearance immediately after the Lease.

 

Prior to Lease (2/19/12)          At Conclusion of Lease (9/15/12)

25.     At some point during the Lease, and while under the care, custody, and control of Trainer, Starman began to physically manifest symptoms of lameness and suffered an injury or injuries (herein referred to as "injury"), including, at least, acute soft tissue injury.

26.    The Meaghers and/or Trainer retained Dr. Baus, a veterinarian, to treat the injury.

Prior to and/or subsequent to the injury, Defendants:

a.    Failed to provide timely farrier care and allowed Starman's hooves/toes to become grossly long such that a break occurred in the hoof/pastern angle, placing Starman at risk of lameness and/or injury;

b.    Allowed Starman to suffer a soft tissue injury and/or other injury;

c.    Failed to notify Plaintiff of lameness, injury, or the need for veterinary care;

d.    Failed to properly diagnose the injury and perform necessary diagnostic tests and imaging that would have definitively identified the cause of Starman's lameness;

e.    Failed to properly treat the lameness and injury;

f.    Drugged Starman to mask his lameness and limping for continued use in work and competitive jumping;

g.    Failed to seek Plaintiff's informed consent to administer treatment or drugs;

h.    Failed to maintain adequate and complete veterinary medical records;

i.    Continued to utilize Starman for competitive jumping while he was lame, limping, and suffering from an undiagnosed injury;

j.    Failed to provide proper ongoing care for Starman and/or follow-up care, including abruptly stopping veterinary care of this lame, undiagnosed, injured horse;

k.    Placed Starman's insurance policy at risk of termination by failing to notify Plaintiff, and by extension, Plaintiff's insurance carrier, Great American Insurance, of lameness, injury, veterinary examinations, and treatment;

l.    Took steps to misrepresent and conceal the injury and five veterinary visits from Plaintiff and the insurer, inclusive of inexplicably paying for veterinary services instead of seeking insurance reimbursement afforded under the Lease;

m.    Allowed Starman to be malnourished toward the conclusion of the Lease;

n.    Failed to provide any veterinary care for Starman's alarming, fast weight loss and resulting skeletal appearance;

o.    Returned Starman to Plaintiff's agent at the conclusion of the Lease in a lame disposition, e.g., unable to walk soundly, and with such severe weight loss as to

create a skeletal appearance; and

    p.   Failed to warn Plaintiff of the condition in which Starman would be returned to Plaintiff's agent so that Plaintiff could be prepared to seek emergency veterinary services, effectively "dumping" this injured animal without explanation.

27.    Upon his return to Plaintiff's agent, Starman finally received proper care, proper sustenance, appropriate veterinary care including magnetic resonance imaging (MRI) to diagnose the injury, aggressive medical treatments, and stall rest, all of which should have been implemented immediately when Starman began to manifest symptoms of lameness during the Lease and with the consent of Plaintiff following immediate notification.

28.    The actions and inactions of Defendants inflicted needless physical harm upon Starman including, but not limited to, acute lameness, career-ending injury, starvation, severe weight loss, muscle atrophy, and retirement.

29.    The actions and inactions of Defendants have resulted in a complete loss of value of Starman to Plaintiff, including sale and lease opportunities, and have required substantial and ongoing medical, boarding, and rehabilitation expenses that will continue into the foreseeable future, as Starman remains unsound to this day.

## II.    Chronology of Events

### A.    Commencement of the Lease

30.    Prior to entering into the Lease, Grace Meagher and/or Trainer conducted one or more "trial ride(s)" on Starman at the stable owned and operated by Plaintiff's agent in North Salem, New York, which included walking, trotting, cantering, and jumping.

31.    During negotiations for the short-term lease, the Meaghers and/or Trainer requested and were afforded the opportunity to conduct a pre-lease veterinary examination on Starman before executing the Lease agreement.

32.     A pre-lease veterinary examination is utilized by a lessee to inspect the lessor's horse, confirm it matches the lessor's representations, and determine its physical serviceability for the lessee's intended use.

33.     Starman passed the pre-lease veterinary examination and the parties executed the Lease agreement.

34.     On or around May 1, 2012, the Meaghers and/or Trainer, or an agent acting on their behalf, picked up Starman from the stable owned and operated by Plaintiff's agent in North Salem, NY for commencement of the Lease.

35.     As of May 1, 2012, all Defendants owed Plaintiff and Starman a duty of care in their respective capacities as Lessee, Rider, Trainer, Custodian, Professional, and/or Veterinarian.

36.     At all times during the Lease, the Meaghers boarded Starman with Trainer at Stony Lane LLC and paid all fees resulting therefrom, in addition to any "member" fees owed to Ox Ridge Hunt Club.

37.     During the Lease, Grace Meagher gained both confidence and experience on Starman, both recreationally and in competition, as he dependably navigated her through competitive jumping classes at various horse shows in, at least, New York and Connecticut.

38.     Grace Meagher enjoyed successes, including winning prize money, while repeatedly jumping Starman in competitions over fences several feet high and/or wide.

39.     Grace Meagher publicly posted pictures on "Facebook" of herself riding Starman throughout the Lease, describing him as "perfect," and stating that he taught her how to gallop. Friends and fellow riders praised her postings and pictures, describing Starman as "gorgeous."

40.     The Meaghers and Trainer were restricted under the terms of the Lease to jump

Starman <u>three</u> times or fewer per week.

41.     During the week of May 23, 2012, Grace Meagher competed with Starman at the HITS on the Hudson Horse Show in <u>four</u> jumper classes.

42.     During the week of June 12, 2012, Grace Meagher competed with Starman at the Ox Ridge June horse show in three jumper classes.

43.     During the week of June 19, 2012, Grace Meagher competed with Starman at the Fairfield Hunt Club June horse show in two jumper classes.

44.     During the week of July 3, 2012, Grace Meagher competed with Starman at the Ox Ridge July horse show in two jumper classes.

45.     During the week of July 5, 2012, Grace Meagher competed with Starman at the Westbrook Shoreline II horse show in three jumper classes.

46.     During the Lease period, in addition to the horse shows above, Grace Meagher jumped Starman for practice, lessons, and/or other horse shows not listed above.

47.     During the Lease period, Trainer e-mailed Plaintiff multiple photographs of Grace Meagher successfully jumping Starman several feet high, including the following image, which Grace Meagher also publically displayed on "Facebook" in a posting dated June 17, 2012.



**B.     The July 2012 Farrier Services**

48.     Evidence of failure to provide proper care for Starman can be traced at least back to July 2012, beginning with the procuring of farrier services.

49.     Performance horses, e.g., equine athletes used for riding and showing, require the routine services of a farrier, a specialist in equine hoof care. The farrier maintains a performance horse's hooves by, at least, keeping them trimmed and balanced at the proper shape and length, so as to fit shoes on their hooves. The farrier also inspects the hooves for signs of disease and potential lameness issues. Adherence to timely, routine hoof maintenance by a farrier is an indispensible part of protecting hoof health, including the structures contained within the hoof capsule, and maintaining soundness.

50.     Trimmed and balanced hooves are vital to the physical health and soundness of a performance horse that endures the rigors of both training and competitive jumping by reducing and/or preventing unnecessary strain exerted on, at least, the toe, soft tissue structures, and joints in or above the hoof, which can cause injury.

51.     Common problems resulting from long toes and hoof imbalance include injuries to the coffin joint, navicular syndrome, muscular pain or strain in the back, and joint inflammation that can exacerbate or lead to irreversible arthritic changes.

52.     Pursuant to the Lease, the Meaghers were responsible for providing and paying for farrier care during the period of the Lease.

53.     Trainer was also responsible for exercising reasonable care to ensure that the horses under her care, custody and control, including Starman, received farrier care at properly scheduled intervals.

54.     At some point early into the Lease term, Trainer's farrier, Mr. Ed Racz, took

medical leave due to a medical condition.

55.     The delay in procuring a replacement for Mr. Racz was lengthy and, as a result, multiple horses under Trainer's care became overdue for farrier care, including Starman.

56.     In or around July 2012, at least two equine professionals observed or were informed that multiple horses under Trainer's care, including Starman, endured a lengthy wait for farrier services between Mr. Racz's leave and his replacement's start date.

57.     The delay in procuring a replacement for Mr. Racz to perform routine hoof maintenance on Starman was so long that, by the time a replacement farrier was procured, Starman's toes had become <u>grossly long</u> and he suffered from a broken/hoof pastern angle.

58.     One individual who personally observed the unreasonable, lengthy wait Starman endured to receive farrier care is a well-known professional riding trainer (hereinafter "Informant").

59.     In or around July 2012, Informant personally witnessed that Starman's hooves were visibly long, overdue for shoeing, and that as Starman's toes grew longer, his movement began to look "slightly off."

60.     Informant vocalized her concern to Grace Meagher about the length of Starman's hooves and warned her Starman was visibly overdue for farrier care.

61.     Informant asked Grace Meagher when Starman's last shoeing occurred. Grace Meagher responded that she did not know.

62.     Based on her personal observations, Informant believed Starman had endured at least a two-month lapse in farrier care.

63.     Upon conclusion of the Lease, Plaintiff's agent stated via text message that Plaintiff's agent "...was told by two sources that Star went more than 8wks no shoeing."

64.     Informant warned Grace Meagher that it was unacceptable to have allowed Starman's hooves to grow so long, and that she was taking an irresponsible risk by riding him in that state.

65.     Informant urged Grace Meagher to tell Trainer that Starman needed immediate farrier care or, at least, a veterinarian to examine him.

66.     Because Informant was concerned for Starman's physical well-being, she extended an offer to Grace Meagher to pay for a farrier to immediately care for Starman's hooves.  Grace Meagher informed Trainer of Informant's warnings and offer.  Neither Grace Meagher nor Trainer accepted Informant's offer.

67.     Subsequently, Dr. Baus was retained to perform a lameness examination on Starman.  The condition of Starman's hooves and the directive to re-shoe him with shorter toes are clearly documented in Dr. Baus's medical record dated July 11, 2012.

68.     As discussed below in more detail, Dr. Baus told Plaintiff in October 2012 that he knew Trainer's farrier took leave because of an injury, and that Starman was not the only horse under Trainer's care to endure a lengthy wait to receive farrier services.

69.     By this time, the Meaghers and Trainer would have had personal knowledge of the length of Starman's hooves, either from their own observations or the warnings of other professionals including, at least, Informant and Dr. Baus.

70.     On July 13, 2012, a replacement farrier, Mr. John Favicchia, was retained to care for Starman's hooves.  His personal observations included, at least, that Starman had very long toes and a broken a broken hoof/pastern angle.

71.     The condition of Starman's hooves around this date was the direct result of the Meaghers' and Trainer's failure to provide Starman with timely farrier services.

72.     Allowing Starman's toes to become visibly and grossly long, along with a broken hoof/pastern angle, was completely avoidable had the Meaghers and Trainer procured the services of a farrier in a timely manner.

73.     The Meaghers and Trainer failed to inform Plaintiff of the lapse in farrier services.

74.     The Meaghers and Trainer failed to inform Plaintiff of Starman's long toes, broken hoof/pastern angle, or any other physical symptoms resulting from the lengthy delay in procuring farrier care.

C.     **The July 2012 Veterinary Services**

75.     As discussed above in more detail, according to the USEF Competition Horse Report, Grace Meagher competed in at least five shows and in a total of at least fourteen jumper classes with Starman prior to July 11, 2012, without the need for veterinary services. Some of these shows were back-to-back. The fourteen classes were predominantly jumper classes, which are generally scored by how quickly a horse and rider team complete a course of fences, including sharp turns and several changes of directions, with the fewest errors, called "faults."

*The July 11, 2012 Visit*

76.     On July 11, 2012, according to Dr. Baus's records, Starman received the first of five veterinary visits in less than the span of two weeks relating to symptoms of lameness.

77.     The medical record for this date states that Starman exhibited an obvious lameness in his right front leg rated at 4 out of 5 (on a scale from 0 reflecting no lameness, to a 5, reflecting non-weight bearing or a complete inability to move).

78.     According to the American Association of Equine Practitioners ("AAEP") guidelines, a 4 out of 5 rating indicates the horse's lameness is obvious at a walk, i.e., the

lameness would be clearly obvious to Dr. Baus, the Meaghers, and Trainer.

79.     A lameness rating of 4 out of 5 indicates that the horse's lameness would be obvious even to a layperson unaccustomed to horses.

80.     The medical record for this date states Dr. Baus's services included, at least, digital radiography on Starman's lower front limbs.  The imaging interpretation notes state that "[n]o lesions [were] noted on radiographs" and confirmed the long toe/broken hoof/pastern angle LF discussed above.  In response to Starman's lameness, Dr. Baus implemented a treatment plan that called for re-shoeing, administering a non-steroidal anti-inflammatory drug (Phenylbutazone, also known as "Bute"), a progression into work as soundness improved, and a notation to re-check Starman the following week.

81.     Dr. Baus was aware the Starman was a leased horse, owned by a lessor.

82.     Dr. Baus's entire medical record for Starman fails to evidence any action taken by Dr. Baus to determine whether the parties that retained him, e.g., the Meaghers and/or Trainer, were authorized to make health care decisions affecting Starman on behalf of Plaintiff.

83.     The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Starman had begun to exhibit symptoms of lameness and was in need of veterinary care.

84.     The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Starman was examined by Dr. Baus on July 11, 2012.

85.     The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Dr. Baus sedated, administered or ordered the administration of drugs, and/or performed diagnostic tests, including digital radiographs, on Starman on July 11, 2012.

86.     Dr. Baus failed to seek informed consent from Plaintiff before sedating, administering or ordering the administration of drugs, and/or performing diagnostic tests on

Starman on July 11, 2012.

87.     The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff of the results of the diagnostic tests conducted on July 11, 2012, including digital radiography relating to Starman's "Front Limbs [Lower Limb]."

88.     The Meaghers paid all expenses associated with the July 11, 2012 veterinary visit.

***The July 13, 2012 Visit***

89.     On July 13, 2012, Dr. Baus conducted a follow-up examination on Starman.

90.     Dr. Baus's medical record for this date notes that Starman jogged "with near soundness," i.e., not completely sound.

91.     Dr. Baus's medical record for this date notes that he had "consulted with Dr. Gaeta," i.e., Plaintiff's veterinarian for Starman.

92.     The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Dr. Baus examined Starman on July 13, 2012.

93.     The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Starman was still not completely sound.

94.     The Meaghers paid all expenses associated with the July 13, 2012 veterinary visit.

***The July 18, 2012 Visit***

95.     On July 18, 2012, Dr. Baus conducted a lameness examination follow-up.

96.     On this date, the horse's unsoundness was rated a 2 out of 5 (i.e., lameness consistently apparent under certain circumstances, such as circling).

97.     Dr. Baus's medical record on this date documents that Dr. Baus sedated and administered an injection into Starman's right front coffin joint that included potent corticosteroids.

98.     Names of medications recorded and/or administered on this day include (i) Banamine injectable 10mls, (ii) one vial of Gentamicin 40mg/ml, (iii) one syringe of Hyvisc, and (iv) one vial of Vetalog.

99.     Dr. Baus's medical record on this day documents a treatment plan including hand walking for two days, followed by a return to work as soundness allowed.

100.    The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Dr. Baus examined, sedated, and administered an injection into Starman's right front coffin joint on July 18, 2012.

101.    Dr. Baus failed to seek informed consent from Plaintiff before sedating or administering an injection into Starman on July 18, 2012.

102.    The Meaghers paid all expenses associated with the July 18, 2012 veterinary visit.

**_The July 21, 2012 Visit_**

103.    On July 21, 2012, Dr. Baus conducted a follow-up examination on Starman.

104.    The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Dr. Baus examined Starman on July 21, 2012.

105.    The Meaghers paid all expenses associated with the July 21, 2012 veterinary visit.

**_The July 24, 2012 Visit_**

106.    Upon receiving notice that Starman's lameness had worsened, or, as Dr. Baus would later describe to Plaintiff during an October 2012 phone call, "was hobbling lame," Dr. Baus returned a fifth and final time to perform a lameness examination follow-up on Starman on July 24, 2012.

107.    The following is Dr. Baus's medical records entry, in its entirety, for the July 24, 2012 visit:

16

*Invoice: GDP1199*
*Line Item: PRLA50 – Lameness Examination Follow Up*
*Was transiently, **acutely lame this morning while ridden.***
*Now: RF 1/5 to the left; 2/5 to the right. **Will continue in work and medicate for the next show.***

(Emphasis added).

108.   As evidenced by his own words in the medical record for July 24, 2012, Dr. Baus observed that Starman was lame in the right front leg while going in both directions.  The noted determination for this lame horse was to "continue in work and medicate for the next show."

109.   On this date, Dr. Baus knew he had visited Starman <u>five</u> times in less than two weeks relating to symptoms of lameness.   Dr. Baus also knew that Starman's lameness was persisting despite any modalities he employed.

110.   The medical record for this visit fails to document any further steps taken to investigate Starman's symptoms of lameness, such as ordering or performing diagnostics.

111.   Dr. Baus's medical record for this date fails to indicate whether diagnostic procedures were offered or whether any conditions prevented Dr. Baus from ordering and/or performing further diagnostics on Starman including, at least, whether the Meaghers and/or Trainer refused to have further diagnostics run.

112.   As of the July 24, 2012 examination, Dr. Baus had not diagnosed the underlying cause of Starman's persistent lameness.

113.   By this date, Starman's persisting symptoms were suggestive and/or symptomatic of a serious injury or condition warranting further diagnostic testing and/or rest.

114.   On July 24, 2012 and going forward, Dr. Baus failed to take any steps to further investigate Starman's lameness, including diagnostic testing such as an MRI.

115.   Further diagnostic testing, such as an MRI, could have quickly and definitively

identified the cause of Starman's lameness.

116.    Dr. Baus and Grand Prix Equine LLC, on their publicly-accessible Facebook page, confirm that an MRI can confirm a diagnosis, as shown in the image below:



117.    In fact, Starman's normal veterinarian, Dr. Gaeta, immediately ordered and performed diagnostics upon Starman's return to his veterinary care at the conclusion of the Lease, including an MRI.

118.    The diagnostics Dr. Gaeta ordered and performed in September 2012, including an MRI, definitively identified the cause of Starman's acute lameness.

119.    Dr. Baus, the Meaghers, and Trainer knew or should have known that an acutely lame horse, whose symptoms of lameness persisted despite any of the modalities employed during Dr. Baus's previous visits, was not fit to be ridden, let alone jumped in competition.

120.    In fact, common sense alone dictates that a lame horse should not be ridden.

121.    Dr. Baus, Trainer, and the Meaghers knew or should have known that working, medicating and competing a lame horse suffering from an undiagnosed condition carried with it an inherent risk to Starman's health by placing him in a situation where he was likely to sustain

further injury.

122.    While Dr. Baus's medical record documents the determination for Starman to continue in work and be medicated "for the next show," the record fails to document a follow up examination, or the intent to follow up and monitor Starman's ongoing, undiagnosed condition, either directly before or after "the next show."

123.    Four days after Dr. Baus's last visit, Grace Meagher competed with Starman at Old Salem Farm in North Salem, New York on July 28, 2012.

124.    Considering both the progression and persistency of Starman's lameness requiring Dr. Baus's veterinary attention five times over the course of two weeks, the four-day interval between Dr. Baus's final stable call and the date of "the next show" was an insufficient amount of time to assess Starman's ability to simply walk and stay sound, much less return to the show arena as a jumper.

125.    Dr. Baus's treatment of Starman during, at least, the fifth visit is suggestive of an influence other than the needs of the patient.  For example, Dr. Baus's treatment plans following the first four visits call for a conservative approach of "walking" and progressions back into work as soundness allowed.  In contrast, the fifth and final treatment plan calls for continuing in work and medicating for competition, despite Starman's clinical presentation of symptoms of lameness.

126.    Dr. Baus knew of Grace Meagher and Trainer's desire to continue showing Starman.  Dr. Baus knew he had not diagnosed the underlying cause of Starman's symptoms of lameness.  The final noted determination of "[w]ill continue in work and medicate for the next show" is not a medical treatment based on a specific diagnosis.

127.    The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Starman

was unsound and had a veterinary visit by Dr. Baus on July 24, 2012.

128.    The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Dr. Baus intended the administration of, or administered medication to, Starman on or after July 24, 2012 and/or that a determination was made for this lame horse to continue in work and be medicated "for the next show."

129.    Dr. Baus failed to seek informed consent from Plaintiff before administering medication to Starman on or after July 24, 2012.

130.    Dr. Baus failed to seek informed consent from Plaintiff before he abruptly stopped providing veterinary care to Starman after July 24, 2012.

131.    The Meaghers, Trainer, and Dr. Baus all failed to inform Plaintiff that Starman would receive no further veterinary care for his undiagnosed lameness for the remainder of the Lease.

132.    The Meaghers paid all expenses associated with the July 24, 2012 veterinary visit.

133.    Plaintiff did not know that during the Lease, Starman received five veterinary examinations in less than two weeks from Dr. Baus related to symptoms of lameness; that digital radiography was taken of his front limbs; that he suffered persistent symptoms of lameness; that his lameness persisted despite any medical modalities employed; and that he was used for work and drugged for purposes of competition despite his symptoms of lameness, until speaking with and receiving Starman's medical records from Dr. Baus via email on October 18, 2012, six weeks after the conclusion of the Lease.

134.    Regarding the condition of Starman's hooves, Dr. Baus told Plaintiff he knew Trainer's farrier took leave because of an injury, and that Starman was not the only horse under Trainer's care to endure a lengthy wait to receive farrier services.

20

135.    From the first day Starman presented symptoms of unsoundness during the lease, Plaintiff was not afforded the opportunity by Defendants to be informed, take preventative measures, seek alternative care, obtain a second opinion, or ensure that Starman received veterinary care to quickly identify, diagnose, and treat Starman's injury.

136.    The failure of Dr. Baus to properly diagnose and treat Starman's ongoing symptoms, notify Plaintiff of his treatment plan, seek informed consent to administer treatment, administer medications and/or injections, and seek informed consent to abruptly stop veterinary care for this horse, suffering from an ongoing, undiagnosed condition, constitute grounds for disciplinary action pursuant to the laws of New York and Connecticut.

### Medical Records as of July 24, 2012

137.    Compounding the aforementioned incomprehensible determination to utilize and medicate this lame horse for competition, Dr. Baus failed to completely, properly, and/or accurately maintain Starman's medical record.

138.    For example, while Dr. Baus's record, dated July 24, 2012, clearly documents a determination for Starman "[to] continue in work and medicate for the next show," suspiciously absent is the name of the intended medication.

139.    The failure to completely, properly, and/or accurately document this pertinent information raises the serious question of what drug Dr. Baus (or the Meaghers/Trainer at his direction) administered and/or intended for administration, capable of enabling an "acutely lame" horse to readily compete as a show-jumper only days later.

140.    Moreover, the medical record for the final visit on July 24, 2012 fails to document, at least, the following:  (i) evidence of adequate time and effort devoted to diagnose and care for Starman's clinical presentation of symptoms of lameness, ii) description of

treatments rendered or treatment options offered, (iii) the name of the intended drug(s), (iv) a dosage schedule, (v) a tapering dose schedule, (vi) a route of administration, (vii) instructions for follow-up care to be provided by the Meaghers and/or Trainer, (viii) evidence of a follow up and/or schedule for follow-up examination, and (ix) any condition(s) preventing further investigation into the reason for Starman's lameness.

141.  Following his prior visits with Starman, Dr. Baus documented the services rendered, names of medications, and prescribed dosages. The record of Dr. Baus, dated July 24, 2012, is in stark contrast to his practice in those earlier visits.

142.  The shocking lack of detail in Dr. Baus's July 24, 2012 medical record demonstrates that Dr. Baus did not devote adequate effort to caring for Starman's symptoms.

143.  Dr. Baus's medical record dated July 24, 2012 is inadequate in that other veterinary professionals and/or the Plaintiff cannot read or understand the treatment that Dr. Baus provided to Starman.

144.  Dr. Baus's medical record dated July 24, 2012 is maintained in a manner discernible only to him without regard to the foreseeable possibility that other veterinarians may need to review his record to provide future care to Starman.

145.  The failure of Dr. Baus to keep adequate medical records constitutes grounds for disciplinary action pursuant to the laws of New York and Connecticut.

***Need for Follow-Up Examination as of July 24, 2012***

146.  The American Veterinary Medical Association ("AVMA") states that once a veterinarian agrees to treat an animal, he cannot neglect his patient and has a duty to continue treatment related to that ongoing medical condition. Clients may terminate the veterinary relationship at any time.

22

147.   Dr. Baus, the Meaghers, and Trainer all had a duty, in their respective capacities, to ensure follow-up care after the July 24, 2012 veterinary visit.

148.   As of the July 24, 2012 exam, Starman was lame and suffering from an undiagnosed injury.

149.   Despite not having rendered a diagnosis to explain Starman's lameness as of the July 24, 2012 visit, Dr. Baus failed to conduct a follow-up examination after that visit, effectively abandoning this lame horse to suffer from ongoing symptoms of an undiagnosed injury without veterinary care.

150.   The Meaghers and Trainer failed to seek the services of another veterinarian to conduct a follow-up examination of Starman.

151.   The Meaghers and Trainer failed to provide further veterinary care or services for Starman between the period of July 24, 2012 and September 1, 2012, when the Lease concluded.

152.   Dr. Baus, the Meaghers, and Trainer all failed to notify Plaintiff that veterinary care for Starman would be ceased, or that a replacement veterinarian should be retained.

153.   Dr. Baus's medical record clearly shows an abrupt and unnatural end to Starman's care, resulting either from Dr. Baus's cessation of treatment or instructions of the Meaghers and/or Trainer for Dr. Baus to stop treatment.

154.   Based on the medical records and common sense, Dr. Baus, the Meaghers, and Trainer missed a critical opportunity to conduct appropriate diagnostics, obtain a diagnosis, properly treat the cause of Starman's lameness, assess Starman's response to treatment, and/or prevent further injury.

155.   The failure of Dr. Baus to follow-up constitutes grounds for disciplinary action pursuant to the laws of New York and Connecticut.

*Great American Insurance*

156.   Plaintiff has maintained an insurance policy containing both major medical and mortality coverage for Starman with Great American Insurance since taking ownership in 2005.

157.   The Meaghers and Trainer had personal knowledge of Plaintiff's insurance policy for Starman.

158.   Pursuant to the Lease agreement, the Meaghers reimbursed Plaintiff for four months of Starman's insurance policy premium.

159.   The Meaghers and/or Trainer failed to notify Plaintiff of Starman's lameness and/or injury, thereby preventing Plaintiff from both filing a claim with Great American Insurance and reimbursing the Meaghers for veterinary payments made in advance, as stated in the Lease agreement.

160.   Instead of seeking the reimbursement for veterinary costs afforded to them in the Lease agreement once a claim was made, the Meaghers and/or Trainer intentionally chose to pay, out-of-pocket, the full amount of medical bills incurred.

161.   Out-of-pocket expenses resulting from Dr. Baus's five veterinary visits were likely in the range of several thousand dollars.

162.   No explanation exists for why the Meaghers and/or Trainer chose to cover insurance premiums during the Lease and then pay, out-of-pocket, thousands of dollars in veterinary bills without seeking reimbursement, other than that the Meaghers and Trainer sought to conceal Starman's lameness, injury, and deteriorating physical condition from Plaintiff.

163.   By choosing to pay out-of-pocket and not seek reimbursement for payments made, the Meaghers and Trainer effectively concealed Starman's injury and deteriorating physical condition from Plaintiff.

164.    The failure to afford Plaintiff the ability to report and provide timely notice of Starman's symptoms of injury to Great American Insurance placed Plaintiff's insurance policy for Starman at risk of termination.

165.    The failure of the Meaghers and Trainer to report the injury to Plaintiff is a breach of the Lease agreement and implied covenants of good faith and fair dealings.

**D.    The July 28, 2012 Competition**

166.    The Meaghers and Trainer had personal knowledge of Starman's lameness, as evidenced by the need for five veterinary visits from Dr. Baus.  The Meaghers and Trainer continued to work and show Starman in competition.

167.    Common sense dictates that continuing to work a lame horse, especially under the influence of pain-blocking drugs, will aggravate and/or cause the horse to suffer further injury, with possible long-term consequences, including retirement.

168.    Four days after Dr. Baus's final visit, Grace Meagher competed on Starman in a total of three "jumper" classes at Old Salem Farm in North Salem, New York on July 28, 2012.

169.    In order to compete at this horse show in New York, the Meaghers and Trainer allowed this lame horse, suffering from an undiagnosed condition, to endure the mental and physical stress of a lengthy and bumpy round-trip trailer ride of approximately fifty miles to and from Old Salem Farm, placing Starman at even further risk of injury.

170.    At the show, the Meaghers and Trainer allowed this lame horse to compete in three show jumping classes, requiring Starman to gallop, repeatedly jump fences several feet high in each class, and land on an injured lower limb after each fence.

171.    At this show, upon information and belief based on Dr. Baus's notes, Starman was drugged for purposes of competition.

172.    Upon information and belief, the Meaghers and/or Trainer administered drugs to Starman by, at least, use of injections, as evidenced by injection sites or "welts" found on Starman's pectoral region in various stages of healing upon return to Plaintiff's agent, and as exemplified in the September 9, 2012 picture below (see right pectoral region).



173.    As a direct and foreseeable result of the Meaghers and Trainer continuing to work and compete Starman, a horse they personally knew to be lame, both when he initially manifested symptoms of lameness and while he continued to suffer from undiagnosed lameness, Starman sustained a career-ending acute injury and, to this day, continues to suffer from lameness resulting from this injury.

**E.    Plaintiff's Visit (August 2012)**

174.    Plaintiff contacted Trainer via telephone to schedule a visit with Starman at Stony Lane LLC in August of 2012.  During this phone call, Trainer informed Plaintiff that Trainer and the Meaghers were incredibly happy with Starman's performance, and that Starman had won ribbons in competitions with Grace Meagher.

175.   Other than the information provided to Plaintiff regarding Starman's success in competition, Plaintiff was unaware of the events that occurred during the Lease when she personally traveled to Stony Lane LLC to visit with Starman on August 9, 2012.

176.   Trainer reminded Plaintiff that she was not allowed to take Starman out of his stall and ride him because it was against Ox Ridge Hunt Club rules for a non-member to do so.

177.   During this visit, Trainer provided Plaintiff with false assurances of Starman's physical condition and actively misrepresented, omitted, and concealed the aforementioned facts and material information about, at least, Starman's physical condition from Plaintiff and, by extension, from Plaintiff's insurer, Great American Insurance.

178.   Plaintiff's visit with Starman was confined to Starman's stall at Stony Lane LLC. For most of Plaintiff's visit, Trainer remained in Starman's stall with Plaintiff.  Trainer watched Plaintiff's reunion with Starman and sung Starman's praises. Trainer represented, at least, that Grace Meagher cried tears of joy about leasing Starman, that Starman boosted Grace Meagher's confidence while showing in competitive jumping classes, that Starman physically met the demands of the Lease, and that Trainer was already interested in re-leasing Starman to another student at Stony Lane LLC.

179.   Multiple sources told Plaintiff that both professionals and amateur riders on the Ox Ridge Hunt Club property gave Starman the nickname "Joey," e.g., after the loyal, heroic character in the movie "War Horse."

180.   Trainer regaled Plaintiff with stories about Grace Meagher's successes in competition with Starman and took out her phone to show Plaintiff numerous pictures of Grace Meagher jumping Starman in shows.

181.   Trainer represented to Plaintiff that Starman's <u>only</u> veterinary care during the

Lease was a routine maintenance injection on his right front leg and assured Plaintiff that Starman had physically fulfilled Trainer's and the Meaghers' expectations throughout the entire Lease.

182.   Trainer assured Plaintiff that Starman was sound and that, in fact, following the injection, that Grace Meagher competed and won classes on Starman and intended to show him again the following week.

183.   Trainer represented that "Dr. Gaeta was already on premises" for the injection, implying that Starman's normal veterinarian, Dr. Ron Gaeta, had performed the injection.

184.   Plaintiff reasonably relied on Trainer's representation that Starman received a maintenance injection by his normal veterinarian, Dr. Gaeta, and did not investigate the matter further.

185.   After the Lease concluded, Plaintiff discovered that, while Dr. Gaeta was present at the Ox Ridge Hunt Club property to render services to other clients, he was not there to treat Starman nor did he render any treatment to Starman.

186.   During Plaintiff's visit, Trainer did not disclose that Starman had developed a lameness that was persistent in nature; that another veterinarian, Dr. Baus, had examined Starman five times related to symptoms of lameness; that radiographs were taken of Starman's lower limbs; that Starman's veterinary care abruptly ended without a diagnosis rendered; or that the treatment plan was to medicate Starman for competition.

187.   By, at least, not allowing Plaintiff to take Starman out of the stall, misrepresenting that Dr. Gaeta administered an injection to Starman, and omitting the identity of the veterinarian that was retained to provide veterinary services to Starman during the Lease, Trainer effectively denied Plaintiff access to information that might reveal, at least, that Starman endured a lapse in

farrier care, manifested symptoms of lameness, sustained undiagnosed injury, and was utilized for competition while continuing to suffer from these ailments.

188.    In fact, Trainer actively represented to Plaintiff that Starman was physically sound, marketable, constantly complimented by both riders and professionals at horse shows and within the barn, and ready to show at a competition the following week.

189.    Plaintiff made it clear to Trainer that, due to health issues, Plaintiff was actively pursuing a sale or lease for Starman after the Lease ended and had discussions with interested parties.

190.    Plaintiff sought Trainer's expertise on securing a purchaser or lessee for Starman at the conclusion of the Lease with the Meaghers.   In her professional capacity, Trainer represented that Starman was marketable, especially for a lease within Stony Lane LLC and/or Ox Ridge Hunt Club and that Trainer would work on Plaintiff's behalf to market and continuously re-lease Starman within her barn.   Trainer represented that she already had a male student in mind to try Starman.

191.    Trainer told Plaintiff, "If I have my way, he'll never leave the property."

192.    Based on Trainer's representations and expert advice that Starman was sound, marketable, and successfully serving the purpose of the Lease as a teacher, riding, and competitive jumping horse, Plaintiff thanked Trainer for taking care of Starman, especially while Plaintiff was ill.   Plaintiff told Trainer that she hoped to revisit Starman and give Grace Meagher a token of appreciation to commemorate her successes with Starman in competition, such as a framed picture of Grace Meagher jumping Starman.

193.    Based on Trainer's representations and expert advice including, at least, that Starman was sound, competed successfully during the Lease, was physically fit to continue

showing, and was readily marketable for another lease and/or sale, Plaintiff began to make additional arrangements for pre-lease and pre-purchase trial rides, including for a serious, interested client planning to fly to New York from Texas.

194.    By procuring client(s) seriously interested in Starman and beginning arrangements for a pre-purchase trial, Plaintiff reasonably, and detrimentally relied on Trainer's representations that, at least, Starman was sound, marketable, showing successfully, and physically fit for continued use as a riding and competitive jumping horse.

195.    The Meaghers failed to inform Plaintiff of the aforementioned facts that transpired during the course of the Lease, and took no action to correct Trainer's omissions and misrepresentations.

196.    The Meaghers failed to respond to a December 2012 letter and a subsequent telephone call from Plaintiff's former counsel, refusing to explain why they failed to ever inform Plaintiff of the events that transpired, or what happened to Starman during the course of the Lease.

**F.    Conclusion of the Lease**

197.    By or around the third week of August 2012, Informant observed Starman in a state of injury and/or deteriorated condition while visiting Stony Lane LLC.

198.    An employee of Stony Lane LLC asked Informant whether Starman looked lame. Informant replied that Starman was visibly lame.

199.    Having personal knowledge that Grace Meagher was leaving for college in Ohio before the end of August 2012, Informant warned her that Starman was visibly unsound, looked thin, and was in need of proper care.  Informant warned her to ensure that Starman was properly fed and urged her to coordinate with Trainer in providing immediate veterinary care for Starman.

200.   Informant further warned Grace Meagher to act prudently by notifying Plaintiff's agent of Starman's condition and returning Starman to Plaintiff's agent before returning to college in Ohio, to ensure that he would receive proper care, including proper feeding, for the remainder of the Lease.

201.   Grace Meagher did not contact Plaintiff or Plaintiff's agent and returned to college soon thereafter.

202.   Starman remained at Stony Lane LLC for the rest of the Lease term.

203.   There were a few days when Trainer was absent from Stony Lane LLC, during the month of August 2012, traveling for, at least, purposes of showing with students at competitions taking place in, at least, Massachusetts and Vermont.

204.   There were several days between Grace Meagher's departure for college and Starman's return to Plaintiff's agent on September 1, 2012 when neither Trainer nor the Meaghers were physically present at Stony Lane LLC to provide proper care to Starman.

205.   During this time and continuing through the remainder of the Lease, in addition to enduring the discomfort of lameness persisting in an undiagnosed state since Dr. Baus's last visit in July 2012, Starman suffered alarming, fast weight loss and muscle atrophy, to the point of appearing skeletal.

206.   During the final week of the Lease term, Trainer contacted Plaintiff's agent to inform her that Starman would be returning at the end of the Lease term because Trainer was not able to secure another interested student to re-lease Starman.

207.   Trainer assured Plaintiff's agent that Starman's lease had gone well for the Meaghers throughout the entire Lease term, and that if she could have re-leased Starman to another student, she would have done so.  Trainer assured Plaintiff's agent that Starman was in

good condition and felt great when she rode him the week before his return to New York. Trainer then discussed with Plaintiff's agent the details of Starman's return to Plaintiff's agent.

208.    Based on Trainer's assurances to Plaintiff's agent that Starman was going well and based on her previous experience leasing ponies into Trainer's care, custody, and control, Plaintiff's agent, and by extension Plaintiff, reasonably relied on Trainer's representations that Starman was going well, in good condition, and physically ready to be re-leased.  Plaintiff's agent then procured clients who were interested in leasing and/or buying Starman and began to schedule "trial" rides for the week following Starman's return.

209.    By procuring clients interested in leasing Starman and arranging "trial" rides, Plaintiff's agent and, by extension, Plaintiff, reasonably and detrimentally relied on Trainer's active and implied representations about Starman's physical condition, soundness, marketability, and capability of being ridden by interested clients.

210.    Starman was put on a horse trailer and returned to Plaintiff's agent in New York on September 1, 2012.

211.    Starman returned in a visibly deteriorated, almost-unrecognizable condition, including a skeletal appearance of protruding ribs, hipbones and backbones, and hollowed eyes.

212.    For Starman to lose such a dramatic amount of weight so quickly, either the Meaghers and Trainer failed to provide Starman with proper sustenance toward the conclusion of the Lease, or they allowed him to suffer from a condition(s) that effectively caused him to starve himself.

213.    Gastrointestinal maladies, including weight loss, gastric distress, and a loss of appetite, are a side effect of drugging a horse.

214.    Prior to Starman's shocking weight loss under Defendants' care, Starman has

never been underweight, let alone to the point of appearing skeletal, while under Plaintiff's exclusive ownership.

215.   As evidenced by photographs taken when Starman was returned to Plaintiff's agent, Starman's skeletal appearance clearly evidenced a horse visibly in need of veterinary care.

216.   A horse physically deteriorating at an alarmingly fast pace, as evidenced by the photographs, experiences suffering during each stage of physical deterioration, including muscle atrophy and loss of body fat.

217.   Neither the Meaghers nor Trainer provided warning of Starman's physically deteriorated condition to Plaintiff or Plaintiff's agent, thereby denying Plaintiff the opportunity and ability to arrange for immediate veterinary medical intervention for Starman.

218.   Starman's condition upon his return is evidenced by the photograph labeled "At Conclusion of Lease" in paragraph 24 of this Complaint, which was taken on September 15, 2012 per the electronic metadata embedded in the digital file, and the photograph in paragraph 172, which was taken on September 9, 2012 per the electronic metadata embedded in the digital file.

219.   Starman's condition upon his return from the Lease can be contrasted to his normal appearance evidenced by, for example, the photograph labeled "Prior to Lease" in paragraph 24 of this Complaint, which was taken on February 19, 2012 per the electronic metadata embedded in the digital file, or the photograph in paragraph 47 of this Complaint supplied by Trainer, taken in June 2012, and sent to Plaintiff via e-mail.

220.   Starman's visibly deteriorated and lame condition upon his return on September 1, 2012, and in the days after his return, was witnessed by at least ten individuals, including many with years of experience in horse care and veterinary medicine.

221.    Starman's skeletal appearance was shocking to Plaintiff such that, in front of multiple witnesses, she fell to the floor in front of Starman's stall sobbing.

222.    Upon seeing Starman's condition upon his return from the Lease, Plaintiff's agent contacted Trainer to inquire about Starman's lameness, weight loss, and why no one had contacted Plaintiff or Plaintiff's agent about his physical deterioration.  Trainer denied Starman had any physical problems and insisted that Starman was in good condition before he left.

223.    Specialized knowledge and experience with horses is not required to know that a limping horse with a skeletal appearance is not in good physical condition.

224.    No longer trusting Trainer's representations, Plaintiff's agent became concerned about the physical condition of a pony that Plaintiff's agent had also leased into Trainer's professional care at Stony Lane LLC, and that remained on Trainer's property after Starman's departure.  Plaintiff's agent then broke with tradition and traveled to Stony Lane LLC for the purpose of personally riding and inspecting the pony's physical condition.

225.    Trainer vocalized her offense to the physical inspection that Plaintiff's agent conducted of the pony and that Plaintiff's agent questioned the care that Trainer provided to the horses in her professional care.

226.    Notably, Trainer previously informed Plaintiff that Plaintiff was not allowed to take Starman out of his stall and ride him because Plaintiff was not a member of Ox Ridge Hunt Club.  However, when Plaintiff's agent arrived to take out and ride the leased pony, Plaintiff's agent was allowed to do so, despite not being a member of Ox Ridge Hunt Club.

227.    Defendants' unconscionable actions, inaction, and callous indifference to Starman, who began to display and continued to display clear and objective signs of being in need of veterinary medical care while in their care, e.g., acute lameness and a skeletal

34

appearance, constitutes a glaring deviation from accepted standards of reasonable and proper care, the cruel consequences of which are depicted in the photographs contained herein.

### G.    Prognosis

228.    As previously stated, at the commencement of the Lease, Starman was in sound condition and passed the Meaghers' pre-lease veterinarian examination whereas, at the conclusion of the Lease, as detailed above, Starman was returned to Plaintiff's agent in New York suffering from a multitude of physical maladies, including career-ending injury.

229.    Upon his return from the Lease, Starman was given proper nutrition, regained weight, and no longer has a skeletal appearance.

230.    Upon his return from the Lease, Plaintiff's veterinarian, Dr. Gaeta, examined Starman and documented visible lameness rated 3.5/4 out of 5, which is obvious at a walk even to a lay person, and one level below extreme.  A nerve block procedure of Starman's right coffin joint resulted in "only a slight improvement."

231.    Dr. Gaeta then ordered an MRI of Starman's right front foot, the results of which revealed marked desmitis (fiber tearing and degeneration) of the medial and lateral collateral ligaments of the coffin joint.  The MRI report includes the following:

> *Significant abnormalities are seen within the medial and lateral collateral ligaments of the coffin joint. The origin of both ligaments have a marked heterogeneous T2 signal increase. The medial collateral ligament signal increase is also abnormal throughout the vast majority of the entire ligament, including the distal P3 insertional site. The pathologies of the lateral collateral ligament appears confined to the site of origin."*

232.    In short, Starman returned from the Lease exhibiting symptoms of acute lameness that resulted from an acute soft tissue injury in the form of fibrous tearing of the medial and, to a lesser extent, lateral collateral ligaments of the coffin joint.

233.    Prior to the Lease, Starman has never sustained nor suffered from a soft tissue

injury while under the ownership of Plaintiff.

234.    Plaintiff has maintained an insurance policy for Starman including major medical and mortality coverage with the same insurance carrier, Great American Insurance, since Plaintiff took ownership in 2005.  At no point during Plaintiff's ownership of Starman did Great American Insurance or any other carrier ever pay out a loss claim for Starman.

235.    Based on the evolution of the injury, Dr. Gaeta was able to ascertain that the injury most certainly <u>occurred during the Lease</u>.

236.    Had Dr. Baus diagnosed, monitored, recognized the symptoms of the underlying cause of Starman's lameness, and/or attempted to medically intervene, or had <u>any</u> of the Defendants intervened by, at a minimum, notifying Plaintiff of Starman's lameness and/or injury when he first began to manifest symptoms of lameness during the Lease, Starman's ultimate prognosis would likely be different.

237.    Upon conclusion of the Lease, Dr. Gaeta implemented an aggressive treatment plan, part of which required Starman to be on almost ninety days of stall rest, e.g., confined to the safety of his stall to promote healing and prevent further injury, which is a restless and difficult situation for a horse.  While on stall rest, Starman experienced behavioral changes and became withdrawn, standing in the back corner of his stall with his head held low.

238.    Additionally, Starman received intensive and costly medical treatments, including multiple Interleukin-1 Receptor Antagonist Protein ("IRAP") therapies, for the therapeutic purpose of aiding in his rehabilitation, in hopes that Starman would be able to walk comfortably during his retirement.

239.    To this day, Starman has not regained soundness and the prognosis for a return to sound use and athletic performance is poor and unfavorable, would risk further injury, and would

require costly specialized rehabilitation, reconditioning care, and treatment for many months or years, with no certainty of his recovery.

240.   Starman has lost all monetary value and use as a show horse, competitive jumper, and serviceably sound riding horse, and Plaintiff has lost any and all opportunities to sell, lease and/or donate Starman to collegiate programs who expressed interest in Starman, a result directly caused by the actions and inactions of Defendants.

241.   At the suggestion of his current veterinarian and Plaintiff's agent, Starman was moved to a facility specializing in the retirement and rehabilitation of horses. To this day, Starman exhibits symptoms of lameness caused by the injury he sustained during the lease.

## COUNT 1:  NEGLIGENCE
### (GRACE MEAGHER AND FREDERICK MEAGHER)

242.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

243.   Grace Meagher and Frederick Meagher owed Plaintiff a duty of care as Lessees and/or Rider under the Lease with Plaintiff.

244.   Grace Meagher and Frederick Meagher breached that duty of care by, at least, failing to provide Starman with timely, proper farrier services; by failing to provide Starman with proper, ongoing, and necessary veterinary services; by jumping and/or training Starman excessively and in breach of the Lease agreement; by placing Starman in a condition where he would be vulnerable to injury; by failing to use reasonable care to prevent Starman's injury; by drugging and then competing with Starman while in an injured state; by failing to notify Plaintiff and, by extension, Great American Insurance of the injury and other events that transpired during the Lease; by failing to seek follow-up veterinary care for Starman; by misrepresenting and concealing Starman's condition; by failing to provide reasonable care and veterinary care to

prevent and treat Starman's sudden and severe weight loss; and by returning Starman to Plaintiff's agent in the State of New York devoid of any value, visibly underweight, and in lame disposition as the result of a career-ending injury.

245.     The direct, proximate, and foreseeable cause of Plaintiff's injuries was the negligent conduct of Grace Meagher and Frederick Meagher, as described above.

246.     As a direct result of Grace Meagher and Frederick Meagher's negligence, Plaintiff suffered substantial damages.

**COUNT 2:  NEGLIGENCE**
**(LISA BEFFERT AND STONY LANE LLC)**

247.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

248.     Lisa Beffert and Stony Lane LLC owed Plaintiff a duty of care as custodian of Starman during the Lease.

249.     Lisa Beffert and Stony Lane LLC breached that duty of care by, at least, failing to provide Starman with timely, proper farrier services; by failing to provide Starman with proper, ongoing, and necessary veterinary services; by jumping and/or training Starman excessively and in breach of the Lease agreement; by placing Starman in a condition where he would be vulnerable to injury; by failing to use reasonable care to prevent Starman's injury; by drugging and then competing with Starman while in an injured state; by failing to notify Plaintiff and, by extension, Great American Insurance of the injury and other events that transpired during the Lease; by failing to seek follow-up veterinary care for Starman; by misrepresenting and concealing Starman's condition; by failing to provide reasonable care and veterinary care to prevent and treat Starman's sudden and severe weight loss; and by returning Starman to Plaintiff's agent in the State of New York devoid of any value, visibly underweight, and in lame

disposition as the result of a career-ending injury.

250.    The proximate and foreseeable cause of Plaintiff's injuries was the negligent conduct of Lisa Beffert and Stony Lane LLC, as described above.

251.    As a direct result of Lisa Beffert and Stony Lane LLC's negligence, Plaintiff suffered substantial damages.

### COUNT 3:  NEGLIGENCE
### (DR. MARK BAUS AND GRAND PRIX EQUINE LLC)

252.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

253.    Dr. Mark Baus and Grand Prix Equine LLC owed a duty of care to Plaintiff in their treatment of Starman as a licensed veterinarian and provider of veterinary care to Starman.

254.    Dr. Mark Baus and Grand Prix Equine LLC breached that duty of care by, at least, failing to properly diagnose Starman's injuries; by failing to properly treat Starman's injuries; by failing to report Starman's injuries and condition to Plaintiff; by recommending that Starman continue in work while undiagnosed; by failing to seek informed consent from Plaintiff to administer drugs to Starman; by failing to maintain adequate medical records for Starman; by failing to monitor Starman's undiagnosed, ongoing, lame condition; and by failing to provide necessary follow-up examinations, leading to further injury and a decline in Starman's weight and health.

255.    The proximate and foreseeable cause of Plaintiff's injuries was the negligent conduct of Dr. Mark Baus and Grand Prix Equine LLC, as described above.

256.    As a direct result of Dr. Mark Baus and Grand Prix Equine LLC's negligence, Plaintiff suffered substantial damages.

**COUNT 4:  GROSS NEGLIGENCE**
**(GRACE MEAGHER AND FREDERICK MEAGHER)**

257.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

258.   Grace Meagher and Frederick Meagher owed Plaintiff a duty of care as Lessees and/or Rider under the Lease with Plaintiff.

259.   Grace Meagher and Frederick Meagher, through their gross negligence, breached that duty of care by acting with reckless disregard and/or failing to exercise even slight care by, at least, failing to provide Starman with timely, proper farrier services; by failing to provide Starman with proper, ongoing, and necessary veterinary services; by jumping and/or training Starman excessively and in breach of the Lease agreement; by placing Starman in a condition where he would be vulnerable to injury; by failing to use reasonable care to prevent Starman's injury; by drugging and then competing with Starman while in an injured state; by failing to notify Plaintiff and, by extension, Great American Insurance of the injury and other events that transpired during the Lease; by failing to seek follow-up veterinary care for Starman; by misrepresenting and concealing Starman's condition; by failing to provide reasonable care and veterinary care to prevent and treat Starman's sudden and severe weight loss; and by returning Starman to Plaintiff's agent in the State of New York devoid of any value, visibly underweight, and in lame disposition as the result of a career-ending injury.

260.   The proximate and foreseeable cause of Plaintiff's injuries was the gross negligence and/or wanton, willful, and reckless conduct of Grace Meagher and Frederick Meagher, as described above.

261.   As a direct result of Grace Meagher and Frederick Meagher's gross negligence and/or wanton, willful, and reckless disregard for the health and safety of Starman, Plaintiff

suffered substantial damages.

## COUNT 5:  GROSS NEGLIGENCE
## (LISA BEFFERT AND STONY LANE LLC)

262.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

263.    Lisa Beffert and Stony Lane LLC owed Plaintiff a duty of care as custodian of Starman during the Lease.

264.    Lisa Beffert and Stony Lane LLC, through their gross negligence, breached that duty of care by acting with reckless disregard and/or failing to exercise even slight care by, at least, failing to provide Starman with timely, proper farrier services; by failing to provide Starman with proper, ongoing, and necessary veterinary services; by jumping and/or training Starman excessively and in breach of the Lease agreement; by placing Starman in a condition where he would be vulnerable to injury; by failing to use reasonable care to prevent Starman's injury; by drugging and then competing with Starman while in an injured state; by failing to notify Plaintiff and, by extension, Great American Insurance of the injury and other events that transpired during the Lease; by failing to seek follow-up veterinary care for Starman; by misrepresenting and concealing Starman's condition; by failing to provide reasonable care and veterinary care to prevent and treat Starman's sudden and severe weight loss; and by returning Starman to Plaintiff's agent in the State of New York devoid of any value, visibly underweight, and in lame disposition as the result of a career-ending injury.

265.    The proximate and foreseeable cause of Plaintiff's injuries was the gross negligence and/or wanton, willful, and reckless conduct of Lisa Beffert and Stony Lane LLC, as described above.

266.    As a direct result of Lisa Beffert and Stony Lane LLC's gross negligence and/or

wanton, willful, and reckless disregard for the health and safety of Starman, Plaintiff suffered substantial damages.

## COUNT 6: GROSS NEGLIGENCE
### (DR. MARK BAUS AND GRAND PRIX EQUINE LLC)

267.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

268.    Dr. Mark Baus and Grand Prix Equine LLC owed a duty of care to Plaintiff in their treatment of Starman as a licensed veterinarian and provider of veterinary care to Starman.

269.    Dr. Mark Baus and Grand Prix Equine LLC, through their gross negligence, breached that duty of care by acting with reckless disregard and/or failing to exercise even slight care by, at least, failing to properly diagnose Starman's injuries; by failing to properly treat Starman's injuries; by failing to report Starman's injuries and condition to Plaintiff; by recommending that Starman continue in work while undiagnosed; by failing to seek informed consent from Plaintiff to administer drugs to Starman; by failing to maintain adequate medical records; by failing to monitor Starman's undiagnosed, ongoing, lame condition; and by failing to conduct necessary follow-up examinations, leading to further injury and a decline in Starman's weight and health.

270.    The proximate and foreseeable cause of Plaintiff's injuries was the gross negligence and/or wanton, willful, and reckless conduct of Dr. Mark Baus and Grand Prix Equine LLC, as described above.

271.    As a direct result of Dr. Mark Baus and Grand Prix Equine LLC's gross negligence and/or wanton, willful, and reckless disregard for the health and safety of Starman, Plaintiff suffered substantial damages.

## COUNT 7:  PROFESSIONAL NEGLIGENCE
### (LISA BEFFERT AND STONY LANE LLC)

272.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

273.    As the providers of horse training and boarding services, and as the parties assigned care, custody, and control of Starman under the Lease, Lisa Beffert and Stony Lane LLC had a professional duty to tend to and care for horses in accordance with the standard of care exercised by professionals of ordinary skill, knowledge, and experience.

274.    Lisa Beffert and Stony Lane LLC breached that duty of care and departed from the standard of care by, at least, failing to provide Starman with timely, proper farrier services; by failing to provide Starman with proper, ongoing, and necessary veterinary services; by jumping and/or training Starman excessively and in breach of the Lease agreement; by working and/or allowing Starman to continue in work while he suffered from ongoing symptoms of lameness, for purposes of riding and competitive jumping; by placing Starman in a condition where he would be vulnerable to injury; by failing to use reasonable care to prevent Starman's injury; by drugging Starman while in an injured state for purposes of competition; by failing to disclose to Plaintiff and, by extension, Great American insurance, material information relating to the physical condition of Starman, including the manifestation of symptoms of lameness and acute injury; by failing to obtain follow-up veterinary care for Starman's ongoing, undiagnosed lameness condition; by misrepresenting and concealing information regarding Starman's physical condition; by failing to provide reasonable care and veterinary medical intervention and treatment for Starman's sudden and severe weight loss, causing him to have a visibly skeletal appearance; by failing to notify Plaintiff of Starman's sudden and severe weight loss; and by returning Starman to Plaintiff's agent in the State of New York devoid of any value, visibly

underweight, and in a lame disposition as the result of a career-ending injury.

275.     The proximate and foreseeable cause of Plaintiff's injuries was the negligent professional conduct of Lisa Beffert and Stony Lane LLC, as described above.

276.     As a result of the aforesaid conduct by Lisa Beffert and Stony Lane LLC, Plaintiff suffered substantial damages.

## COUNT 8:  PROFESSIONAL NEGLIGENCE
## (DR. MARK BAUS AND GRAND PRIX EQUINE LLC)

277.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

278.     As a licensed veterinarian and provider of veterinary services, and as the veterinarian formally retained to treat the patient Starman during the Lease, Dr. Baus and Grand Prix Equine LLC had a professional duty to exercise the same care, skill, and diligence in treating patients consistent with that of other members of the veterinary medical profession in good standing in the locality or community of their practice, or in similar communities.

279.     Dr. Mark Baus and Grand Prix Equine LLC breached that duty of care and departed from the standard of care by, at least, failing to properly diagnose Starman's injuries; by failing to properly treat Starman's injuries; by failing to disclose Starman's lameness and/or injury and physical condition to Plaintiff; by determining a course of treatment for a lame horse, suffering from a persisting, undiagnosed injury, that included continuing in work and/or improper use of drugs to mask Starman's lameness for the purpose of competition; by allowing the interests of a trainer/rider to influence a patient's treatment plan; by failing to seek informed consent from Plaintiff to administer drugs to Starman; by failing to maintain adequate medical records for Starman; by failing to monitor Starman's ongoing, undiagnosed condition; and by failing to conduct follow-up examinations, thereby effectively abandoning the patient and

leading to further injury and a decline in Starman's weight and health.

280.    The proximate and foreseeable cause of Plaintiff's injuries was the negligent professional conduct of Dr. Mark Baus and Grand Prix Equine LLC, as described above.

281.    As a result of the aforesaid conduct by Dr. Mark Baus and Grand Prix Equine LLC, Plaintiff suffered substantial damages.

## COUNT 9:  LACK OF INFORMED CONSENT
### (DR. MARK BAUS AND GRAND PRIX EQUINE LLC)

282.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

283.    Dr. Mark Baus and Grand Prix Equine LLC failed to disclose to Plaintiff the examination and treatment of Starman on at least five occasions in July 2012.

284.    Dr. Mark Baus and Grand Prix Equine LLC failed to disclose to Plaintiff the administration of drugs to Starman on at least three occasions, including the material, inherent, and substantial risks involved in the administration of said drugs.

285.    Dr. Mark Baus and Grand Prix Equine LLC failed to discuss with Plaintiff alternative treatments or medications.

286.    Dr. Mark Baus and Grand Prix Equine LLC failed to discuss with Plaintiff the full health history of Starman, which might affect his treatment plan.

287.    As a result of the aforesaid failures to inform Plaintiff, Dr. Mark Baus and Grand Prix Equine LLC did not obtain Plaintiff's informed consent.

288.    If Plaintiff had been adequately informed of the material, inherent, and substantial risks associated with, for example, administering drugs to enable Starman to compete in horse shows while suffering from an undiagnosed lameness, Plaintiff and reasonably prudent persons would not have consented.

289.    As a proximate result of the wrongful conduct of Dr. Mark Baus and Grand Prix Equine LLC in not seeking informed consent, Starman sustained further injury or, at the very least, Plaintiff was prevented from seeking care for Starman.

290.    As a direct result of Dr. Mark Baus and Grand Prix Equine LLC's failure to seek informed consent, Plaintiff suffered substantial damages.

## COUNT 10:  TRESPASS TO CHATTEL
## (ALL DEFENDANTS)

291.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

292.    Defendants damaged Plaintiff's personal property, Starman, to the extent that he suffered a career-ending injury and is physically incapable of serving as a riding and show horse.

293.    The proximate cause of Plaintiff's injuries was the physical harm Defendants caused to Plaintiff's personal property.

294.    As a direct result of one or more of Defendants' acts of trespass and the injuries resulting from those acts, Plaintiff lost the value of her property.

295.    As a result of the trespass, Plaintiff suffered substantial damages.

## COUNT 11:  CONVERSION
## (ALL DEFENDANTS)

296.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

297.    Starman is the sole and exclusive property of Plaintiff and, as such, Plaintiff has an unconditional and exclusive right to possession of Starman.

298.    Defendants exercised dominion over and/or interfered with Plaintiff's property, in defiance of Plaintiff's rights, to the extent that Starman suffered, at least, career-ending injury

and is physically incapable of serving as a riding and show horse.  The actions and inactions of Defendants so materially altered Starman's physical condition as to change his identity and character such that a demand, on the part of Plaintiff, for possession of the horse would have been useless because the Defendants could not have returned Starman back to Plaintiff in his unaltered state.

299.    The actions and inactions of Defendants, causing a material alteration in Starman's physical condition, deprived Plaintiff of her property in a manner that was both inconsistent with, and seriously interfered with, Plaintiff's personal property, in derogation of Plaintiff's rights.  Even though Defendants did not permanently deprive Plaintiff of possession of Starman, they are nonetheless liable for conversion due to their material alteration of Starman's physical condition, rendering him valueless and useless for the ordinary purposes of a horse, including riding, showing, and grazing in pastures without a limp.

300.    Plaintiff's injuries and damages normally would not have occurred in the absence of Defendants' conversion.

301.    As a direct result of one or more of Defendants' aforementioned acts of conversion and the injuries resulting from those acts, Plaintiff lost the use and value of her property.

302.    As a result of the acts of conversion, Plaintiff suffered substantial damages.

## COUNT 12:  BREACH OF CONTRACT
## (GRACE AND FREDERICK MEAGHER, LISA BEFFERT, AND STONY LANE LLC)

303.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

304.    In exchange for a monetary sum, Plaintiff entered into the Lease with Grace Meagher and Frederick Meagher as Lessees and/or Rider, and with Lisa Beffert and Stony Lane

LLC as agent.  Lisa Beffert and Stony Lane LLC contracted to have care, custody, and control of Starman during the Lease.  Plaintiff performed under the Lease by providing Starman to Grace Meagher and Frederick Meagher under the terms of the Lease, and the Meaghers accepted Starman.

305.    Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC breached the contract by, at least, failing to provide proper farrier and veterinary services; by jumping and/or training Starman excessively and in breach of the Lease agreement; by allowing Starman to be injured; by failing to notify Plaintiff and, by extension, Great American Insurance of the injury and other events that transpired during the Lease; by failing to seek follow-up care for Starman; and by failing to return Starman in the same condition in which he left Plaintiff's agent at the commencement of the Lease.

306.    As a result of the breaches of contract, Plaintiff suffered substantial damages.

## COUNT 13:  BREACH OF GOOD FAITH AND FAIR DEALINGS
## (GRACE AND FREDERICK MEAGHER, LISA BEFFERT, AND STONY LANE LLC)

307.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

308.    A covenant of good faith and fair dealing is implied in every contract.

309.    In exchange for a monetary sum, Plaintiff entered into the Lease with Grace Meagher and Frederick Meagher as Lessees and/or Rider, and with Lisa Beffert and Stony Lane LLC as agent.  Lisa Beffert and Stony Lane LLC contracted to have care, custody, and control of Starman during the Lease.  Plaintiff performed under the Lease by providing Starman to Grace Meagher and Frederick Meagher under the terms of the Lease.

310.    Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC have materially breached their implied covenant of good faith and fair dealings under the Lease by, at

least, depriving Plaintiff of the rights and benefits of the contract by their dishonest and bad faith conduct, including, but not limited to, drugging and then competing with Starman while in an injured state; making medical decisions not in the best interests of the horse, and without consulting with Plaintiff; misrepresenting and concealing Starman's condition, including hindering Plaintiff's inspection during an August 2012 visit; preventing Plaintiff from carrying out the responsibility of making a claim with Great American Insurance; preventing Plaintiff from providing proper farrier and veterinary services during the Lease term; and departing from industry practices.

311.   As a result of the breaches of good faith and fair dealings, Plaintiff suffered substantial damages.

## COUNT 14:  BREACH OF FIDUCIARY DUTY
### (LISA BEFFERT, STONY LANE LLC, DR. MARK BAUS AND GRAND PRIX EQUINE LLC)

312.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

313.   Lisa Beffert and Stony Lane LLC, in their capacity as Trainer, Custodian, and Professional were entrusted with providing care to Starman; had custody and control of Starman during the Lease; marketed Starman to potential purchasers and/or lessees within their barn; were responsible for providing Plaintiff with honest, timely, and expert material information relevant to affairs entrusted to them.  Lisa Beffert and Stony Lane LLC had a fiduciary duty to act in good faith and in the best interest of Starman, a living animal, and Plaintiff.

314.   Dr. Mark Baus and Grand Prix Equine LLC, in their capacity as Veterinarian and provider of veterinary services, were entrusted with providing veterinary care to Starman; were responsible for making medical decisions in the best interest of the patient; and were responsible

for providing Plaintiff with honest, timely, and expert material information relevant to affairs entrusted to them.  Dr. Mark Baus and Grand Prix Equine LLC had a fiduciary duty to act in good faith and in the best interest of Starman, a living animal, and Plaintiff.

315.   Lisa Beffert and Stony Lane LLC breached their fiduciary duty by failing to act in the best interests of Starman, including at least the actions and inactions that lead to Starman's injuries and retirement as detailed in paragraphs 1-241, and the misrepresentations and concealment detailed in paragraphs 1-241.

316.   Dr. Mark Baus and Grand Prix Equine LLC breached their fiduciary duty by failing to act in the best interests of Starman, including at least the actions and inactions that lead to Starman's injuries and retirement, the failure to notify Plaintiff of an injury and treatment plan, and the failure to seek informed consent from Plaintiff, all as detailed in paragraphs 1-241.

317.   As a proximate result of the breaches of fiduciary duty by Lisa Beffert, Stony Lane LLC, Dr. Mark Baus, and Grand Prix Equine LLC, Plaintiff suffered substantial damages.

## COUNT 15: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (ALL DEFENDANTS)

318.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

319.   Defendants have committed tortious acts that have prevented business relationships between Plaintiff and third parties from occurring, and in particular, the sale and/or lease of Starman to a third party.

320.   Defendants knew that Starman was available for sale and/or lease.

321.   Defendants knew that Plaintiff actively marketed and generated interest in Starman, and had begun discussions with third parties interested in Starman for lease and/or sale.

Defendants knew of Plaintiff's expectancy to enter into a contractual relationship with at least one third party interested in Starman.  These relationships contained the substantial probability of future economic benefit in the form of, at least, profitable contracts for the lease or sale of Starman.

322.   Had Defendants refrained from engaging in the dishonest and improper conduct by wrongful means, including, at least, fraud, misrepresentation, trespass to chattels, and conversion, there is a substantial probability that Plaintiff would have entered into a contractual relationship with at least one of the third parties interested in leasing and/or purchasing Starman.

323.   As a result of Defendants' tortious interference, Plaintiff suffered substantial damages.

## COUNT 16:  FRAUDULENT MISREPRESENTATION
## (GRACE AND FREDERICK MEAGHER, LISA BEFFERT, AND STONY LANE LLC)

324.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

325.   Grace Meagher and Frederick Meagher, as Lessees and/or Rider, and Lisa Beffert and Stony Lane LLC, as custodian of Starman during the Lease, owed Plaintiff a duty to provide correct, material information regarding Starman in their relationship with Plaintiff as Lessees, Rider, and/or Custodian, on which Plaintiff could reasonably and justifiably rely.

326.   Lisa Beffert and Stony Lane LLC, as custodian of Starman during the Lease, owed Plaintiff a duty to provide correct, material information in their relationship under the Lease.

327.   Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC intentionally misrepresented and/or failed to provide material information to Plaintiff by, at least, falsely representing that Starman had been competed in sound condition throughout the entire

Lease; omitting that Starman was drugged for competition while lame and suffering from an undiagnosed condition; falsely representing that Starman's only veterinary care during the Lease was a maintenance injection; falsely representing that Starman received this injection from his normal veterinarian, Dr. Gaeta; falsely representing the number of veterinary examinations that Starman received during the Lease; falsely representing to Plaintiff that Starman was sound and continued to be sound following routine veterinary care; failing to advise Plaintiff that Starman was utilized in work while in a lame disposition; falsely representing that Starman was in sound condition, physically capable of being ridden, physically capable of being used for competition, and readily marketable for re-lease and/or sale; falsely representing that the reason Trainer was not able to secure a re-lease for Starman was due to a lack of interested students; and falsely representing that Starman would be returned in good health and in sound disposition.

328.   Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC's misrepresentations, omissions, and failures to disclose were material in that they caused physical injury to Starman and prevented sale and lease opportunities for Starman.

329.   Plaintiff suffered substantial damages as a direct and proximate result of her reasonable and justifiable reliance on Defendants' intentional misrepresentations, omissions, and failures to disclose.  Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC's actions were intentional, willful, malicious, reckless and in conscious disregard of Plaintiff's rights.

## COUNT 17:  NEGLIGENT MISREPRESENTATION
### (GRACE AND FREDERICK MEAGHER, LISA BEFFERT, AND STONY LANE LLC)

330.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

331.   Grace Meagher and Frederick Meagher, as Lessees and/or Rider, and Lisa Beffert

and Stony Lane LLC, as custodian of Starman during the Lease, owed Plaintiff a duty to provide correct, material information regarding Starman in their relationship with Plaintiff as Lessees, Rider, and/or Custodian, on which Plaintiff could reasonably and justifiably rely.

332.    Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC Meagher failed to exercise reasonable care or competence in obtaining or communicating information to Plaintiff and Plaintiff's agent by, at least, falsely representing that Starman had been competed in sound condition throughout the entire Lease; omitting that Starman was drugged for competition while lame and suffering from an undiagnosed condition; falsely representing that Starman's only veterinary care during the Lease was a maintenance injection; falsely representing that Starman received this injection from his normal veterinarian, Dr. Gaeta; falsely representing the number of veterinary examinations that Starman received during the Lease; falsely representing to Plaintiff that Starman was sound and continued to be sound following routine veterinary care; failing to advise Plaintiff that Starman was utilized in work while in a lame disposition; falsely representing that Starman was in sound condition, physically capable of being ridden, physically capable of being used for competition, and readily marketable for re-lease and/or sale; falsely representing that the reason Trainer was not able to secure a re-lease for Starman was due to a lack of interested students; and falsely representing that Starman would be returned in good health and in sound disposition.

333.    Defendants intended and had actual knowledge that Plaintiff would rely on information supplied by them regarding Starman's physical condition, soundness, veterinary and farrier care, and physical suitability for re-lease or sale, throughout the entire Lease term.

334.    Plaintiff reasonably relied on the representations of Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC that Starman was sound, fit to show, physically

capable of being ridden by a new lessee or buyer, and readily marketable for re-lease or sale and, in reliance thereron, procured clients interested in leasing and/or buying Starman.

335.    As a result of the aforementioned negligent misrepresentations by Defendants, Plaintiff suffered substantial damages.

## COUNT 18:  FRAUDULENT CONCEALMENT
## (GRACE AND FREDERICK MEAGHER, LISA BEFFERT, AND STONY LANE LLC)

336.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 as if fully set out in this count.

337.    Grace Meagher and Frederick Meagher, as Lessees and/or Rider, and Lisa Beffert and Stony Lane LLC, as custodian of Starman during the Lease, owed Plaintiff a duty to provide correct, material information regarding Starman in their relationship with Plaintiff as Lessees, Rider, and/or Custodian, on which Plaintiff could reasonably and justifiably rely.

338.    Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC, having actual knowledge of material facts, intentionally concealed such material facts before, during, and after Plaintiff's August 9, 2012 visit to Stony Lane LLC and in August communications with Plaintiff's agent, including at least the following material facts:  the fact that Starman suffered a lapse in farrier care; the fact that Starman suffered grossly long toes and a broken hoof/pastern angle; the fact that Starman was jumped in excess of the Lease term restrictions; the fact that Starman began to manifest symptom of lameness in July 2012; the fact that Starman's lameness was persistent in nature; the fact that Dr. Baus provided veterinary care to Starman during the Lease; the fact that Starman's lameness required veterinary attention five times in less than two weeks; the fact that diagnostic tests were conducted, including digital radiographs of Starman's lower front limbs, and the results of these tests; the fact that Starman's lameness persisted despite any veterinary medical modalities employed; the fact that Starman was drugged for competition

to mask his lameness; the fact that Starman's veterinary care was abruptly terminated while he suffered from an undiagnosed lameness; the fact that Starman was utilized for riding and competitive jumping while suffering from an undiagnosed lameness; the fact that Starman lost a formidable amount of weight toward the end of the Lease; the fact that Starman physically deteriorated to the point of a visibly skeletal appearance; the fact that Starman was no longer sound, marketable, or physically capable of being ridden, leased, or sold; and the fact that Starman would return to Plaintiff's agent visibly underweight and exhibiting obvious lameness resulting from a career-ending acute injury.

339.   Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC had knowledge of these material facts and had a duty to disclose these material facts to Plaintiff.

340.   Plaintiff could not have reasonably discovered these material facts, and was reasonably misled.

341.   By concealing these facts, Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC intended to deceive Plaintiff, who relied on Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC to not conceal material information.

342.   As a result of the aforementioned fraudulent concealment by Grace Meagher, Frederick Meagher, Lisa Beffert, and Stony Lane LLC, Plaintiff suffered substantial damages.

### COUNT 19:  UNFAIR TRADE PRACTICES
### (LISA BEFFERT AND STONY LANE LLC)

343.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-241 and Counts 16 and 18, as if fully set out in this count.

344.   Lisa Beffert and Stony Lane LLC engage in a consumer-oriented business involving the sale, lease, training, and care of horses, and hold themselves out to the public as the operators of a high-quality show barn.  Owners and operators of a show barn entrusted with the

55

care, custody, and control of a living animal must provide honest, truthful, accurate, and timely information relating to the animal's physical state and medical needs, i.e., the material information that a reasonable consumer, e.g., horse owner, would expect to receive, at least as a matter of public policy and common decency.

345.   Lisa Beffert and Stony Lane LLC intentionally and willfully misrepresented and concealed the material events that transpired during the course of the Lease, of which they had actual knowledge, and in particular the physical deterioration of Starman's health, as described above in at least Counts 16 and 18 and in reckless disregard of Plaintiff's rights.  Lisa Beffert and Stony Lane LLC continued to intentionally and willfully misrepresent material facts even when confronted by Plaintiff and Plaintiff's agent after the conclusion of the Lease.  As such, Lisa Beffert and Stony Lane LLC engaged in deceptive acts or practices in the conduct of business, trade and/or commerce that offend public policy and are immoral, unethical, oppressive, and/or unscrupulous.

346.   Lisa Beffert and Stony Lane LLC engaged in deceptive actions that concern the entrepreneurial aspects of her business.  A significant portion of Lisa Beffert and Stony Lane LLC's business is the procurement of horses for clients to purchase, lease, ride, and show in competition.  The mistreatment inflicted on Starman and the substantial damage Plaintiff suffered arose out of such a transaction(s) and unfair trade practices, and the aforementioned concealment and misrepresentations relating to material information about Starman occurred in the conduct and furtherance of such trade and/or commerce.

347.   As a result of Lisa Beffert and Stony Lane LLC's unfair trade practices, Plaintiff suffered substantial damages.

## DAMAGES AND INJURIES

As an actual and proximate result of Defendants' actions, Plaintiffs suffered direct, indirect, presumed, and special damages, in amounts to be determined by the trier of fact including, but not limited to, the value of Starman and ongoing rehabilitation expenses.   In addition, the individual Defendants are liable to Plaintiff for punitive or exemplary damages for their conduct.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an ORDER that:

A.      Declares that Defendants are liable under Counts 1-19 above;

B.      Awards Plaintiff monetary damages to account for all damages suffered by Plaintiff in an amount to be determined at trial;

C.      Awards Plaintiff statutory, punitive, and special damages;

D.      Awards Plaintiff pre-judgment and post-judgment interest and costs; and

E.      Awards Plaintiff such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury in this action on all issues triable by jury.

Respectfully submitted,

Date:  May 30, 2013

Janel Grant
256 West Main Street
Mount Kisco, NY 10549
Telephone:  (914) 295-0039
E-Mail:  InReStarman@gmail.com

## <u>Exhibit A</u>

### Photos of Starman over Fences



**Starman, 2008**



**Starman, 2009**



**Starman, 2010**



**Starman, 2011**



**Starman, 2011**



**Starman, 2011**



**Starman, June 2012**



**Starman, September 15, 2012**
*(Condition witnessed by multiple individuals
as of September 1, 2012)*

**Exhibit B**

| May 1, 2012 | Commencement of Lease |
|---|---|
| Week of May 23, 2012 | USEF Horse Report states Grace Meagher and Starman compete at HITS on the Hudson, in four jumper classes. |
| Week of June 12, 2012 | USEF Horse Report states Grace Meagher and Starman compete at the Ox Ridge June Horse Show, in three jumper classes. |
| Week of June 19, 2012 | USEF Horse Report states Grace Meagher and Starman compete at the Fairfield Hunt Club June show, in two jumper classes and M&S Children's Horse Medal class. |
| Week of July 3, 2012 | USEF Horse Report states Grace Meagher and Starman compete at the Ox Ridge July I horse show, in two jumper classes. |
| Week of July 5, 2012 | USEF Horse Report states Grace Meagher and Starman compete at the Westbrook Shoreline II show, in three jumper classes. |
| July 11, 2012 | Dr. Mark Baus (Grand Prix Equine) performs lameness examination on Starman, including digital radiography on Starman's front lower limbs and a nerve block on the horse's right front coffin joint.  Dr. Baus's Lameness Report on Starman records the following findings:<br>• "LF Findings: Grossly long toe and broken hoof/pastern angle."<br>• "RF Findings: Long toe; hoof/pastern angle in more alignment than left."<br>• On a lameness scale of 0-5, Starman's RF was 4/5 going while going straight; Notes: "Walks with obvious lameness RF."<br>• After nerve block, Starman's RF was 1/5 going straight; Notes: "Dramatic improvement noted in 10 minutes (still mildly lame at 5 minutes) No fluid obtained when joint injected."<br>• Treatment Plan: "Will reshoe with shorter toes. Give bute 2 gms/tablets twice daily for 3 days.  Begin walking 2 days after shoeing and progress activity as soundness improves. We'll recheck next week." |
| July 13, 2012 | Dr. Baus performs follow-up exam and notes Starman "jogs with near soundness. Will return to light work and increase and soundness allows." |
| July 13, 2012 | Farrier John Favicchia trims and shoes Starman. |
| July 18, 2012 | Dr. Baus performs follow up examination and injects coffin joint.  Dr. Baus's Lameness Report on Starman records the following findings:<br>• "RF Findings: Moderate coffin joint effusion. Right more than left."<br>• On a lameness scale of 0-5, Starman was 2/5 going to right and left.<br>• Treatment Plan: "Will handwalk for two days and return to work. Will increase work as soundness allows. Water fluid from coffin joint injection (RF only joint injected)." |
| July 21, 2012 | Dr. Baus performs follow-up exam and notes "Much better today. No lameness noted in RF in either direction. DLF: negative. Will resume normal riding." |
| July 24, 2012 | Dr. Baus performs lameness examination on Starman and notes "Was transiently, acutely lame this morning while ridden. Now: RF 1/5 to the left; 2/5 to the right. Will continue in work and medicate for the next show." |
| July 28, 2012 | USEF Horse Report states Grace Meagher and Starman compete in the Old |

|  | Salem Farm July horse show, in three jumper classes. |
|---|---|
| August 9, 2012 | Owner visits Starman at Stony Lane.  Starman remains in stall for entire visit. |
| September 1, 2012 | Lease period ends and Starman returns to Autumn Farms visibly unsound, underweight, and in the condition depicted in the Complaint. |